COMMERCIAL ACETYLENE CO. v. AVERY PORTABLE LIGHTING CO.

(Circuit Court, E. D. Wisconsin. January 13, 1909.)

1. PATENTS (§ 14*)—SUBJECTS OF PATENT—COMPOUND PATENTABILITY—SCIENTIFIC DISCOVERIES.

The discovery that acetone used as a solvent for acetylene gas makes a solution having none of the explosive properties of either substance singly, and which may be safely handled and transported, when embodied in a device for utilizing the same, is patentable.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 11; Dec. Dig. § 14.*]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—ACETYLENE GAS TANKS.

The Claude & Hess patent No. 664,383, for an apparatus for storing acetylene gas, consisting essentially of a tank containing acetone as a

solvent supersaturated with acetylene gas, was not anticipated and discloses invention, and is entitled to a fair range of equivalents in view of its undoubted utility. Also, *held* infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

3. PATENTS (§ 99*)—APPLICATION—REQUISITES.

An applicant for a patent is not required in his application to elaborate the scientific theory underlying his invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 133–139; Dec. Dig. § 99.*]

In Equity.   On final hearing.

See, also, 152 Fed. 642.

This is a bill in equity charging infringement of United States letters patent No. 664,383, involving an invention of Claude & Hess for improved apparatus for storing acetylene gas, issued December 25, 1900, and United States letters patent issued May 24, 1901, to Edmund Fouche, No. 727,609, for apparatus for storage of gases; which two patents were by mesne assignments transferred and assigned to complainant.

The answer specifically denies the several averments of the bill, and avers that both of said letters patent in all substantial and material parts have been anticipated in the prior art, setting up many references to former patents in this country and in Europe; and further averring that, during the prosecution of the applications which resulted in the issue of said two patents, the respective applicants so limited and restricted their respective claims in compliance with the requirements of the Patent Office, in view of the state of the art, that complainant is now estopped from contending that said claims cover anything more than the exact specific device shown and described in said letters patent. Infringement is specifically denied.

Upon the final hearing complainant withdrew its contention as to the Fouche patent, so that the issues in the case are limited to the Claude & Hess patent.

Bartlett, Brownell & Mitchell and Carl F. Geilfuss, for complainant.
Chamberlin & Wilkinson and Ferdinand A. Geiger, for defendant.

QUARLES, District Judge (after stating the facts as above). It may be well in the first instance to consider the contention of estoppel supposed to result from abandonment of claims during proceedings in the Patent Office. The file wrapper and contents of the patent in suit show that Claude & Hess had pending at the same time two distinct applications, one for the method or process of forcing acetylene gas under pressure into a solvent for the purpose of storing and transporting such gas, and the other for the apparatus or package adapted to receive and store a supersaturated solution of acetylene for safe and convenient transportation.

After the proofs were closed herein, the defendant moved the court that the case might be opened, and for leave to introduce surrebuttal proofs on behalf of the defendant, for the purpose of putting in evidence the file wrapper and contents of the method application, to show the abandonment by Claude & Hess of a certain claim therein made which the Patent Office was willing to allow. This motion was resisted, and on May 20, 1907, the same was denied by the court, "without prejudice to the renewal thereof upon terms."

On November 8, 1907, the motion was renewed to permit defendant to take further testimony in surrebuttal, which motion was denied,

except as to certain proofs touching the Fouche patent. It thus appears that the defendant had no authority for offering in evidence the file wrapper of the method application, and that the same is not properly before the court, although printed as part of the defendant's proofs.

Complainant has objected at every stage to the introduction or use of such file wrappers, and this objection was renewed on final hearing. For these reasons I do not feel at liberty to consider the proceedings in the Patent Office touching the method application, or the claimed abandonment predicated thereon. The evidence, therefore, does not show what became of the process application, except that no patent was granted thereon.

The claims of the Claude & Hess patent here in dispute are Nos. 1, 2, and 5, which are as follows:

"(1) A closed vessel containing a supersaturated solution of acetylene produced by forcing acetylene into a solvent under pressure, said vessel having an outlet for the acetylene gas which escapes from the solvent when the pressure is released or reduced. and means for controlling said outlet whereby the gas may escape therethrough at substantially uniform pressure, substantially as described.

"(2) A prepared package consisting of a tight shell or vessel; a solvent of acetylene contained within said vessel; and acetylene dissolved in and held by said solvent under pressure and constituting therewith a supersaturated solution, the package being provided at a point above the solvent with a reducing-valve, substantially as and for the purpose set forth."

"(5) As a new article of manufacture, a gas package comprising a holder or tight vessel; a contained charge of acetone; a volume or body of gas dissolved by and compressed and contained within the solvent; and a reducing-valve applied to an opening extending to the interior of the holder above the level of the solvent, substantially as set forth."

It would not be profitable to review in detail the long and bitter contest in the Patent Office before these three claims were allowed. The primary difficulty seems to have been to what extent the solvent supersaturated with gas might be considered an element of the combination in the apparatus patent. The office was disposed to consider the closed vessel and the reducing-valve as the only legitimate elements of the apparatus disclosure.

Claim 1 was rejected by the examiner as an aggregation, on the strength of Morgan Envelope Co. v. Albany Paper Co., 152 U. S. 425, 431, 14 Sup. Ct. 627, 630, 38 L. Ed. 500, where the court say:

"The first defense raises the question whether, when a machine is designed to manufacture, distribute, or serve out to users a certain article, the article so dealt with can be said to be a part of the combination of which the machine itself is another part."

Along this line the examiner suggested striking out of the claim the word "containing," and inserting instead thereof the words "adapted to contain" the solvent, so as to leave for consideration only the closed vessel with its inlet and outlet valves. This would have been fatal, because it was in the first instance decided that the closed vessel with the two valves containing acetylene gas involved no patentability.

A long contest in the office followed. It was finally held on appeal that, as an apparatus for storing and distributing acetylene gas, the

solvent, with supersaturated solution of acetylene, might constitute an element of the combination, and a claim was suggested by the board, which is claim 1 of the patent in suit. The subsequent controversy in the office was mainly as to whether the other claims suggested by Claude & Hess were within the scope of the above suggestion. But after repeated arguments and references, especially to the patent upon the thermometer with its bulb and stem, and the column of mercury contained therein, it seems to have been decided that the liquid and gaseous contents of this package might be legitimately suggested as elements of the combination constituting the package; but it was insisted that it should be specifically limited to a supersaturated solution of acetylene gas. To meet this requirement a broad amendment was inserted in the specification, lines 10 to 25, which seemed to satisfy the scruples of the board, without any formal change in the reading of the fifth claim; and claim 5, which had been in controversy, seems to have been allowed with claims 1 and 2. The court cannot find any substantial ground for the contention that claim 5 was allowed to slip through by mistake. As the record stands, there can be no doubt that Claude & Hess would be estopped if they claimed the right to handle any other kind of gas in this package.

The second issue is the patentability of the invention. It is contended that no invention is disclosed by Claude & Hess, but that, in view of the state of the art, their alleged discovery involves merely mechanical skill.

Time and space preclude a review of the learned and interesting discussion of expert scientists preserved in the record as to Henry's law with its many variations, or the general knowledge of the solubility of all gases in liquids, and the conclusions that might be naturally drawn therefrom by one skilled in the art.

There is one feature of the Claude & Hess discovery which is of paramount importance, namely, the peculiar affinity of acetone for acetylene, and especially the modifying influence of each upon the other when combined in a supersaturated solution. Acetone is volatile and inflammable, and its vapor when mixed with air is explosive. Acetylene is highly explosive. Defendant suggests no law of physics, or treatise, or source of information that would have led to the discovery that both elements would become harmless when so combined. Claude & Hess were the first to make known these peculiar and wonderful properties, which they must have discovered by actual experiment. This fact is attested by the literature of the art and by the testimony here adduced.

Prior to the discovery of Claude & Hess, acetylene was a well-known illuminant. Its brilliancy was appreciated. The simplicity and cheapness of its production had attracted general attention, but its explosive nature had put a ban upon its use. Every expedient to compress it for the purpose of transportation failed, and in many instances had been attended with disaster. As Prof. Hallock testifies:

"Prior to the introduction of the tanks referred to here in suit, the use of acetylene was practically restricted to those cases where it could be immediately generated at the time and place where it was to be used."

The principle in physics that all gases were soluble in liquids was well understood. What is known as "Henry's Law" had been familiar for a hundred years, that, broadly speaking, the quantity of gas that a liquid would absorb depended upon the pressure under which it was introduced. These general principles had been already embodied in commercial packages containing water charged with ammonia gas, and beverages charged with carbonic acid gas, etc. But it seems evident that these primary laws and their former crude embodiment did not and could not lead to the discoveries brought to light by Claude & Hess. It was by patient experiment that they learned that acetone under a pressure of 12 atmospheres would absorb acetylene to the extent of 300 times its own bulk; that, when combined in solution, these inflammable and explosive substances would tolerate the introduction of a platinum wire heated to a white heat, without explosion: that such mixture would not freeze, and was not corrosive; that the two substances were miscible at all temperatures; and that, if a small quantity of the solvent escaped with the gas, it would not retard combustion. In short, Claude & Hess were the first to discover a practical and safe method of storing and transporting these dangerous substances—a consummation long sought and one of transcendent importance. They devised means for putting a valuable and cheap illuminant within easy reach of the general public. It was not necessary for them in their application to elaborate the scientific theories underlying their invention. Dixon-Woods Co. v. Pfeifer, 55 Fed. 395, 5 C. C. A. 148; Eames v. Andrews, 122 U. S. 40, 7 Sup. Ct. 1073, 30 L. Ed. 1064; Warren Steam Pump Co. v. Blake (C. C. A.) 163 Fed. 263; Hogan v. Westmoreland Co. (C. C.) 163 Fed. 289; Cleveland Foundry Co. v. Detroit Co., 131 Fed. 853, 68 C. C. A. 233.

It is a cheap and easy thing to say, after the fact, that any skilled chemist might have arrived at the discovery by application of well-known physical laws. There are comparatively few patents that could escape this plan of attack. The avidity with which this discovery has been adopted for commercial purposes, the safety and success that have attended its introduction, attest its great utility. It appears that one of complainant's licensees has already equipped over 20,000 automobiles with this gas package. If we were to calculate the utility of the invention by the number of persons who are enjoying its benefits, it would easily take its place in the front rank of recent discoveries.

Reference is now made to the James patent, No. 240,423, which was not cited or considered in the Patent Office. It is contended that this patent completely anticipates the Claude & Hess invention. James used a dry, solid substance such as charcoal for an absorbent, into which the gas was forced under pressure. The final conclusion of the Patent Office, that the solvent supersaturated with gas may constitute a legitimate element of the combination and an essential part of the package, would seem to deprive this reference of any relevancy here.

In concluding the discussion on the question of patentability, we may state concisely what Claude & Hess have accomplished by their discovery.

First. By equipping the gas package with acetone as a solvent, they have enormously increased the storing capacity of the tank, rendering it possible to store under moderate pressure 300 times as much acetylene gas as could otherwise be compressed therein. Second. They have disclosed the chemical changes that take place in both gas and liquid when so combined, which render both innocuous and capable of safe transportation. These two features of the discovery clearly entitle the inventor to protection, under the following authorites cited by complainant's attorneys: Celluloid Co. v. American Co. (C. C.) 35 Fed. 301; Celluloid Co. v. Crane (C. C.) 36 Fed. 110; Frost v. Cohn, 119 Fed. 505, 56 C. C. A. 185; Edison v. United States Co., 52 Fed. 300, 308, 3 C. C. A. 83; Rumford Co. v. N. Y. Co., 134 Fed. 385, 67 C. C. A. 367; Smith v. Vulcanite Co., 93 U. S. 486, 23 L. Ed. 952.

It is further urged by way of defense that the package of Claude & Hess, which employed no porous packing, was palpably unsafe and impracticable, because an open space was left above the liquid solvent. This attack seems to be predicated upon general principles, as no proof was directed to the subject by defendant, beyond a cross-examination of one of complainant's experts.

The evidence offered by complainant tends to show that the Claude & Hess package was in point of safety a vast improvement over everything theretofore disclosed in the prior art. Mr. Little, one of complainant's experts, when asked whether he considered the Claude & Hess package safe without the porous filling disclosed by Fouche, answered that:

"While relatively not as desirable if unfilled with porous material, still, relative to anything in the prior art I regard the Claude & Hess package as incomparably safer than anything previous."

Prof. Hallock, another of complainant's experts, having his attention drawn to the subject, answered in substance that such package would be safe for transportation and use if handled with care and intelligence.

Claude & Hess in their literary disclosure had advocated the use of asbestos to render the liquid in the tank immobile. Shortly thereafter, Fouche obtained a patent for filling the package with asbestos, into which the acetone was admitted, claiming not only that the liquid contents was rendered immobile, but that the danger of explosion was limited thereby; that this feature was a decided improvement upon the Claude & Hess package was universally recognized. So that, while in practice the asbestos filling has been generally adopted, the fact remains that it is but an improvement upon the basic discovery of Claude & Hess, and in no wise impairs their claim to recognition as original inventors.

This brings us to the main issue of infringement. The theory of the defendant is that, this being a combination of old elements, the defendant escapes infringement by omitting either of the essential elements in the combination. It is claimed that the defendant's device does not employ the automatic valve which is disclosed by the drawings of Claude & Hess. In the specifications, line 97, this valve is described as "a reducing-valve, d, of any suitable or usual construction."

This valve has also an adjusting stem, $d^5$, which required manual adjustment, and controlled the caliber of the outlet. The first question here presented is whether the inventors are to be confined to the details of this description, or whether it is to be looked upon within the ordinary rule of preferable method.

It is practically conceded that the defendant has appropriated every other feature of the Claude & Hess device, and seeks to differentiate his machine by the use of an outlet-valve of different construction. The defendant employs at the outlet what is called a "needle valve," which will be hereafter particularly described. That Claude & Hess are not limited to the specific valvular construction shown in the drawing is so conclusively established by the reasoning of the court in the Paper Bag Case, 210 U. S. 405, 419, 28 Sup. Ct. 748, 52 L. Ed. 1122, that we dismiss the point by a simple reference to that case. The settled principle of law is that the invention is to be measured by the claims. Let us then proceed to consider the claims.

The language of the first claim is—

"means for controlling said outlet whereby the gas may escape therethrough at substantially uniform pressure."

It is evident that the needle valve of defendant infringes this broad claim, if the gas escapes therethrough "at substantially uniform pressure." It is desirable to obtain a clear understanding of this needle valve. Mr. Little, one of the complaint's experts, gives the following description:

"These valves are of the sort known as 'needle valves,' in which, relative to the diameter of the aperture, the seat is very long and the valve stem is tapered down to a fine, acute point, which construction is well known to permit of an exceptionally nice and accurate regulation of the amount of gas passing through the valve. The orifice created by raising the valve after the manner followed in practice is so minute that the friction of the gas passing through is great and its rate of discharge substantially uniform over long periods. As a result, under the conditions of practice, the substantially uniform and slight pressure necessary for the proper combustion of the gas at the burner tips is similarly maintained, the gas pressure on the tank being through the action of the valve continuously and regularly reduced to the burner pressure, as I have proved by experiments of my own."

Mr. Little further testifies:

"The fact is simply that Avery and everybody else found almost at once, as indeed will appear to any one upon a mere inspection of the conditions, that this old device—that is, the well-known needle valve—would secure such a substantially uniform pressure as is required by the patent, and that therefore such structure infringes claim 1."

Mr. Fremont Wilson, a consulting engineer of large experience, sworn on behalf of the complainant, testified in substance that the needle valve is constructed and used to reduce and regulate the flow of gas or liquids, and that this is its only function, and that in actual practice a substantially uniform pressure is secured thereby.

Prof. Haines, the expert for defendant, admits that claim 1 is broader than the other claims—

"covering, as one of its elements, a reducing-valve or any other device that may perhaps be discovered for producing the same effect as a reducing-valve."

The logical result of his testimony is to read the description into the claim; but his concession as to some equivalent yet to be discovered may well apply to an old element that practically discharges the functions of the so-called "reducing-valve."

But to my mind the actual tests which were made with this needle valve on tanks of defendant are of greater value than the opinions of expert witnesses. Prof. Hallock in his testimony described numerous tests ranging from 5 to 21 hours, with different pressures ranging from 5 to 15 atmospheres, all of which demonstrated that the needle valve in practice did maintain a substantially uniform pressure, and that the light was as bright and satisfactory at the end of such tests as at the beginning. No proof was offered by defendant to question the correctness of his conclusions. But what is still more convincing is the combined experience of the myriads of users of these packages, who are illuminating every road and thoroughfare of this country. It is in evidence that the Prest-O-Lite Company, one of the licensees of the complainant, uses the needle valve, and that this one company has equipped more than 20,000 automobiles with this gas package. If the needle valve did not furnish substantial uniformity in pressure, the present popularity and success of gas tanks so equipped could never have been reached. So that we have the opinion of competent experts produced by the complainant, corroborated by careful tests made in the laboratory, and confirmed by general use and experience of the gas package. So that I feel constrained to hold that the needle valve infringes the first claim of the patent in suit.

Claims 2 and 5 stand upon a somewhat different footing. This being a combination patent, and the inventors having in these two claims designated a "reducing-valve" as an element, are bound thereby, and, if the defendant dispenses with any reducing-valve or equivalent structure, it does not infringe. Fay v. Cordesman, 109 U. S. 408, 420, 3 Sup. Ct. 236, 27 L. Ed. 979.

We are thus confronted with the question whether the needle or throttle valve of defendant is a "reducing-valve" within the meaning of the claims. This is a question of fact to be determined by the evidence. As illustrating this claim, we go to the specifications and find that the inventors say:

"This reducing-valve may be of any suitable or usual construction."

And further they say:

"It is not intended to limit the invention to the specific construction herein shown, since modifications may obviously be made."

Four experts called by the defendant treat the expression "reducing-valve" as a technical term, which they say means an automatic valve; and Prof. Haines contends that a valve is not entitled to be called a "reducing-valve" although it does in fact reduce or regulate the pressure, if it is manually regulated. He admits that he uses the term "quite independently of the meaning of the two words comprising the term." He cites two dictionaries that give a definition that favors his construction; but the dictionaries do not agree, because Mr. Little refers to the Standard, which is of equal authority, and the defi-

nition there is practical and not technical, and omits entirely the automatic feature.

We now pass to complainant's testimony. Prof. Hallock interprets this term according to its natural popular significance:

"A reducing-valve is a form of valve which in general enables the operator to produce a smaller pressure upon one side of the valve than upon the other."

After examining the needle valves in evidence, he testified in substance that this valve may properly be defined as a "reducing-valve," and that, as applied to defendant's tank and its requirements, this valve is a reducing-valve.

Mr. Arthur Little, who is at the head of the largest commercial laboratory in the country, with great experience as chemist and engineer, among other things testifies:

"All that an automatically acting pressure regulating-valve could possibly accomplish if set in place upon defendant's package, and all that any one would expect of it, would be the maintenance of a substantially uniform pressure in the pipe beyond the valve. Defendant's valve does exactly this, and under the conditions of use does it just as well as the most complex type of automatically-acting pressure-reducing valve could do it. The reason is simply that the predetermined conditions are such that the automatic feature of an automatically-acting pressure-reducing valve would not be called into play to any extent which could be recognized during any period of use, because, on the high side of the valve in such a package, there is a sustained and nearly uniform pressure which is several thousand times greater than the pressure on the low side of the valve; and this pressure itself is for a long time automatically sustained as the solvent gives up its gas to restore the equilibrium disturbed by the passage of gas through the valve orifice. Defendant's valve is, therefore, under these conditions and for the required period of use, just as much and just as properly a reducing-valve, whether in the literal sense in which the term is used by Prof. Hallock, or in the special sense given to it by Prof. Haines, as any automatically-acting pressure-reducing valve could be. This being true of the things concerned, it seems to me that the mere form of words affords Prof. Haines no escape from my own conclusion—that defendant's structure does in fact include a reducing-valve and a very efficient and thoroughly satisfactory one. For these reasons, it is my opinion that defendant's structure is the structure contemplated and described in claim 2 of the Claude & Hess patent in suit, and is fully covered thereby."

Mr. Fremont Wilson, who has had large experience in installing light plants, specifies two specific instances which came under his own observation, where tanks of large size were installed without any automatic reducing-valve. One of these was on Governor's Island in New York Harbor, where he illuminated the barracks for a full-dress ball from 8 p. m. until 2 a. m. with 40 or 50 burners, and that the valve operated satisfactorily and was not disturbed throughout the entire evening. He states that, while the candle power had decreased, the brilliancy of the flame remained, and the guests never knew the difference.

I regard it as unnecessary to pass upon the precise point so vigorously discussed by experts, because, whether the needle valve is, within the meaning of the claim, a "reducing-valve," it clearly is an equivalent for the valvular construction shown in the application, within the field of alleged infringement. The needle valve was well known when the patent in suit was granted. In the tanks of defendant it discharges

all the functions of the manually regulated outlet valve and of the diaphragm suggested in the Claude & Hess drawing. Its substitution to reduce and regulate the pressure is one that involved no invention, but was obvious to any mechanic skilled in the art. In these small packages employed by defendant, calculated to supply two constant burners for comparatively short periods of time, the automatic feature would have no function to perform. The pressure within the tank is so enormous, as compared with the slight pressure that is permissible at the burner, that for a very considerable period the diminution of pressure within the tank would have no appreciable effect upon the size or brilliancy of the flame, and hence a substantially uniform flow of gas would result, which is the result contemplated by the inventor and desired by the user.

In Sewall v. Jones, 91 U. S. 173, 183, 23 L. Ed. 275, the Supreme Court lay down a test of infringement in the following language:

"To infringe a patent it is not necessary that the thing patented should be adopted in every particular. If the patent is adopted substantially by the defendants, they are guilty of infringement. * * * The question of infringement depends upon whether the plan which the defendant has employed is in substance the same as the plaintiff's, and whether all the differences which have been introduced are not differences in circumstances not material, and whether it is not in substance and effect a colorable evasion of the plaintiff's patent. * * * It is not necessary that defendant should employ plaintiff's invention to as good advantage as he employed it, or that the result should be the same in degree."

What is the pith of this invention? It is to furnish means to store compactly and transport safely acetylene gas for illuminating purposes. The novelty consists in employing a solvent which has the wonderful properties and advantages that have been rehearsed. In such a package there must necessarily be an inlet and outlet. But the inventive thought was not concerned with the specific structure of the outlet valve. It was obvious that by some means the enormous pressure within the tank should be reduced so as to sustain a steady flame at the burner.

It is worthy of remark that the inventor had in mind not only the small gas package suitable for automobiles, but large tanks to illuminate cars, boats, and buildings, where numerous burners would be required, and where the number of burners would fluctuate from time to time. For such tanks an automatic regulator might well be suggested as preferable, while, as the evidence shows, in the small package employed by defendant, an automatic valve would practically have no function to perform.

In short, the defendant appropriates the entire discovery of Claude & Hess, but puts it to a special use where no automatic control is either necessary or desirable. Instead of the valvular construction suggested as preferable by the patent, it substitutes a well-known mechanical device, which, for the purposes of its machine, discharges the same function and secures the same uniform pressure contemplated by the inventors. Under the authorities, such differentiation will not afford escape from infringement. Paper Bag Case, 210 U. S. 405, 28 Sup. Ct. 748, 52 L. Ed. 1122, and cases cited.

In Miller v. Eagle Manufacturing Co., 151 U. S. 186, 207, 14 Sup. Ct. 310, 38 L. Ed. 121, it was held that the range of equivalents depended upon the extent and nature of the invention. If the invention is broad or primary in its character, the range of equivalents will be correspondingly broad. Similar expressions occur in several other opinions. These cases were quite generally construed to mean that it was only the pioneer patent that was entitled to invoke the doctrine of equivalents. In the Paper Bag Case, supra, the Supreme Court has corrected this erroneous construction, and awards to every meritorious inventor the benefit of the doctrine of equivalents according to the amount of invention embodied in the patent, applying the same rule to a secondary as well as a pioneer patent.

Regarding the gas package of Claude & Hess, equipped with acetone and a supersaturated solution of acetylene gas as proper elements in the combination, there is nothing in the prior art to narrow this invention. Claude & Hess accomplished what no one before them had been able to accomplish. They brought to light discoveries regarding the properties of certain substances which were of great public utility, and in my judgment they are entitled to a liberal construction of the doctrine of equivalents, and clearly are entitled to claim the equivalent employed by the defendant in its package.

For these reasons, I find that the defendant has infringed each of the claims 1, 2, and 5 of the patent in suit. An interlocutory decree may be prepared in accordance with this opinion.